13 CV 8304

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X

WANDA SINCLAIR, DIANE SHERARD,
ELIZABETH MERCADO, and SHARON
HOLDER,

                          Plaintiffs,

-against-


THE CITY OF NEW YORK, MATHEW
WAMBUA, RUTHANNE VISNAUSKAS,
ERIC ENDERLIN, ROBIN WEINSTEIN,
MICHAL ARONSON, JESSICA KATZ,
BEATRIZ DE LA TORRE, CLARE FARNEN
and JOHN and JANE DOES 1-5 (said names
being fictitious, the persons intended being those
who aided and abetted the unlawful conduct of
the named Defendants),

                          Defendants.
------------------------------------------------X

Docket No.:



**COMPLAINT**

**JURY TRIAL REQUESTED**

       Plaintiffs, by their attorneys, **MADUEGBUNA COOPER LLP**, complaining

of the defendants, allege, upon information and belief, as follows:

## NATURE OF THIS ACTION

       1.     Plaintiffs bring this action to secure protection of and to redress

deprivation of rights, privileges and immunities secured by the Civil Rights Act of

1871, 42 U.S.C. § 1983, 42 U.S.C. § 1981, as amended by the Civil Rights Act of

1991, 42 U.S.C. § 1981(a) ("Section 1981"); the New York Human Rights Law as

contained in New York State Executive Law, § 296 *et. seq.* ("NYHRL") and New

York City Human Rights Law as contained in the Administrative Code of the City of

New York, § 8-107 *et seq.* ("NYCHRL"), providing for injunctive relief and other relief against discrimination on the basis of race, color, ethnicity, ancestry, and age.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 2617(a)(2).

3.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all State and City law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

4.     Venue is proper in the United States District Court for the Southern District of New York because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PROCEDURAL REQUIREMENTS

5.     Prior to commencement of this action, Plaintiffs served a copy of the complaint upon the New York City Human Rights Commission and the Corporation Counsel of the City of New York in accordance with New York City Administrative Code Section 8-502(c).

## PARTIES

### Plaintiffs

6.     Plaintiffs are African-American and Hispanic individuals, over the age of 40 years, currently or previously employed by Defendant, CITY OF NEW YORK ("CITY" or "City") in the New York City Department of Housing Preservation and Development ("HPD").

7.     Plaintiffs are also tenured employees of the City and HPD, with at least eight (8) years or more of serving the City in various capacities within HPD, including but not limited to: Project Managers, Housing Development Specialists, Deputy Directors, and Directors.

8.     Based on their respective backgrounds and individual work experience, Plaintiffs participate in, supervise, direct, and manage housing development projects under programs and initiatives established for the purpose of preserving and developing the City's affordable housing stock.

9.     Plaintiffs duties and responsibilities are overseen and managed by supervisors who are mostly white-Caucasian.

### Plaintiffs

10.    Plaintiff Wanda Sinclair ("SINCLAIR") is an African-American woman aged 60 years, and a resident of the City of New York, Borough of Brooklyn.

11.    Since 1978, SINCLAIR has been continuously employed by the City and HPD in various capacities, including Property Manager, Project Development Coordinator, Deputy Director, and Mortgage Officer.

12.    SINCLAIR currently holds the Civil Service  title of Associate Housing Development Specialist at HPD, a title in which she has remained for nearly twenty (20) years, since 1993.

13.    At all times relevant to this lawsuit, SINCLAIR performed the duties of Underwriter/Mortgage Officer, with responsibility for managing complex housing development projects from conception and financing to closing, under various HPD development programs, including the Participation Loan Program ("PLP").

14.    In 2010, SINCLAIR took the Open Competitive examination for the City Planner position and in 2012 was certified on the Civil Service list.

15.    Plaintiff DIANE SHERARD ("SHERARD") is an African-American woman aged 56 years, and a resident of the City of New York, Borough of Queens.

16.    From 1985 to December 2013, SHERARD was employed by HPD in various capacities, including Real Property Manager, Community Coordinator, Associate Real Property Manager, Housing Development Specialist II, Deputy Director, Brooklyn South Planning, and Deputy Director, Brooklyn Planning (Associate Housing Development Specialist).

17.   At all times relevant to this lawsuit, SHERARD performed the duties of Deputy Director, Brooklyn Planning, with responsibility for: facilitating housing development and comprehensive neighborhood revitalization through community based planning; facilitating the City's 10-year New Housing Marketplace Plan for the creation and preservation of affordable housing; coordinating the land use approval process for complex/high-priority multi-million dollar affordable housing development initiatives and urban renewal plans/projects in consultation with Community Boards, the Department of City Planning and other agencies; initiating and overseeing allocations, including project Certificate to Proceed approvals, grant agreements, and registration of funds; preparing and managing or assisting with affordable housing project Requests for Proposals; preparing analyses of site conditions; gathering and analyzing data for neighborhood assessments and presentations; training, supervising, and assisting staff; drafting and preparing reports and presentation materials; representing HPD at Community Board and City Planning Commission meetings to convey the department's positions on planning and housing projects and issues; preparing materials and drafting correspondence in response to communications from local leaders, elected officials, and community members; serving as principal assistant to the Director, as well as performing the duties of the Director in his absence.

18.   Plaintiff Elizabeth Mercado ("MERCADO") is a Hispanic American

woman aged 54 years, and a resident of the City of New York, Borough of Bronx.

19.    Since January 1985, MERCADO has been continuously employed by the City and HPD in various capacities, including Unit Chief of the Tenant Interim Lease Program ("TIL"), Deputy Director of TIL, Director of Training, Housing Development Specialist, Project Manager, and Underwriter/Mortgage Officer for PLP.

20.    MERCADO currently holds the Civil Service title of Housing Development Specialist at HPD, a title in which she has remained for nearly twenty-five (25) years, since 1988.

21.    At all times relevant to this lawsuit, MERCADO performed the duties of Underwriter/Mortgage Officer, with responsibility for underwriting construction loans for complex housing development projects from conception and financing to closing, under various HPD development programs, including the Participation Loan Program ("PLP"), and Small Owners Repair Program.

22.    Plaintiff, Sharon Holder ("HOLDER"), is an African-American woman aged 58 years, and a resident of the City of New York, Borough of Brooklyn.

23.    From 1984 to 2013, HOLDER was continuously employed by HPD in various capacities, including Real Property Manager, Associate Real Property Manager, Deputy Director of Commercial Leasing, Project Manager, City Planner

- 6 -

(Deputy Director), and Mortgage Officer, Article 8A Loan Program.

24.    At all times relevant, HOLDER held the Civil Service title of City
Planner in HPD's Office of Preservation Finance, a title she held for nearly ten
(10) years. HOLDER also served as Deputy Director of North Brooklyn Planning
for ten (10) years.

## Defendants

25.    Defendant City is a municipal agency existing by virtue of the laws of
the State of New York.

26.    Defendant HPD is a public agency of the City.

27.    Defendant MATHEW WAMBUA ("WAMBUA") was, at all times
relevant herein, the Commissioner of HPD.

28.    At all relevant times, in his capacity as Commissioner, WAMBUA
was responsible for developing and implementing the policies, practice and/or
customs of the HPD.

29.    At all relevant times, in his capacity as Commissioner, WAMBUA
also retained ultimate responsibility for the hiring, screening, training, retention,
supervision, discipline, counseling and control of the individual defendants named
herein.

30.    WAMBUA is sued in his personal and official capacities.

31.    Defendant RUTHANNE VISNAUSKAS ("VISNAUSKAS"), a white

female, was, at all times relevant, a Deputy Commissioner of HPD, in charge of the Office of Development.

32. In September 2013, VISNAUSKAS was appointed HPD Commissioner.

33. Upon information and belief, at all relevant times, VISNAUSKAS is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

34. Defendant VISNAUSKAS is sued in her official and individual capacities.

35. Defendant ERIC ENDERLIN ("ENDERLIN"), a white male, is and was at all times relevant, an employee at HPD holding the offices of Assistant Commissioner, Associate Assistant Commissioner, and Acting Deputy Commissioner.

36. In June 2013, ENDERLIN was appointed Deputy Commissioner of HPD.

37. Upon information and belief, at all relevant times, ENDERLIN is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

38.    Defendant ENDERLIN is sued in his official and individual capacities.

39.    Defendant ROBIN WEINSTEIN ("WEINSTEIN"), a white female, is and was, at all times relevant, the Executive Director of Operations in the Office of Development.

40.    Upon information and belief, at all relevant times, WEINSTEIN is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

41.    Defendant WEINSTEIN is sued in her official and individual capacities.

42.    Defendant MICHAL ARONSON ("ARONSON"), a white female, is and was, at all times relevant, a Director of Operations of HPD, in charge of the Division of Preservation Finance.

43.    Upon information and belief, at all relevant times, ARONSON is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

44.    Defendant ARONSON is sued in her official and individual capacities.

45.   Defendant JESSICA KATZ ("KATZ"), a white female, is and was, at all times relevant, an Assistant Commissioner of HPD, formerly in charge of the Division of Preservation Finance, and is currently the Assistant Commissioner of Special Needs Housing.

46.   Upon information and belief, at all relevant times, KATZ is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

47.   Defendant KATZ is sued in her official and individual capacities.

48.   Defendant BEATRIZ DE LA TORRE ("DE LA TORRE"), a white Hispanic female under 40 years of age, was, at all times relevant, an Assistant Commissioner of HPD, in charge of Planning, Marketing and Sustainability.

49.   In September 2013, DE LA TORRE was appointed Deputy Commissioner, Strategy & Operations.

50.   Upon information and belief, DE LA TORRE, at all relevant times, is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

51.   Defendant DE LA TORRE is sued in her official and individual capacities.

52.    Defendant CLARE FARNEN ("FARNEN"), a while female, is and was, at all times relevant, the Director of Marketing and Leasing at HPD.

53.    Upon information and belief, at all relevant times, FARNEN is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

54.    Defendant FARNEN is sued in her official and individual capacities.

## FACTS COMMON TO ALL CLAIMS

### HPD Maintains a Pattern and Practice of Discrimination

55.    Between 2000 and 2006, Defendant HPD instituted policies and practices designed to hire, retain and reduce the rate of turnover amongst younger and mostly white-female employees.

56.    Often referred to as "High Performers at risk of leaving the agency," HPD has provided a multitude of hiring, promotion and career advancement opportunities for these younger and overwhelmingly white newer employees, who are defined as employees with "seven (7) years or less" in the agency.

57.    In or about 2000, HPD initiated a "Housing Fellows" program under the direction of former Commissioner Richard Roberts. The "Housing Fellows" program continues to date. Throughout 2007 and 2008, similar policies and programs—such as the "Peer to Peer," "Development Rotational," and the

"Housing Mentoring"—were instituted to provide exposure and training exclusively for these newer, younger and overwhelmingly white employees.

58.   Many of the younger and overwhelmingly white employees hired between 2005 and 2008 were hired as "Urban Fellows," "interns" or were recent college graduates, with little or no job-related housing finance experience.

59.   Pursuant to HPD's preferential policies and practices, these newer, younger employees were provided special treatment and diverse opportunities to move and advance within various HPD programs and, in some instances, from division to division, providing them with a more diverse and deeper overall experience within the agency.

60.   Defendant HPD did not offer comparable opportunities to the Plaintiffs—tenured staff defined by HPD as employees with "eight or more years" in the agency—who were older, and predominantly non-white.

61.   Defendant HPD's deliberate policies and practices of providing special opportunities and exposure to these younger, white employees has enhanced their professional growth and led to guaranteed career advancement and salary increases. These opportunities often manifested in high-profile and premiere projects that garnered publicity for the agency.

62.   Within a five (5) year period from 2008 to 2013, following the institution of the preferential policies, many of these newer employees have been

rapidly promoted to senior positions such as Director, Deputy Director, Director of Operations, Senior Policy Analyst, Chief of Staff, and other positions with supervisory responsibilities and at higher salaries. Often times, the newer employees were appointed as Directors and Deputy Directors of programs, with only one or two permanent staff persons, or were assigned Housing Fellows or Interns as interim staff.

63.     HPD has acknowledged that tenured employees, such as the Plaintiffs, are viewed only as a resource for leveraging information and for nurturing and training the newer hires.  That perception and reality, together with the active policy and practice of favoring the newer, younger white employees,  has marginalized the tenured staff and has created an atmosphere within HPD that promotes and condones "career and salary stagnation" for the older employees above the age of 40 years, particularly those who are of African-American, Hispanic, or non-white race.

64.     For several years, prior to and following the institution of the discriminatory and nepotistic policies above described, the Plaintiffs and other well-qualified staff have performed the same work as the newer, younger employees, with limited or no career advancement and without any salary increases, except for customary across-the-board increases negotiated through the collective bargaining process.

65.   Furthermore, Plaintiffs not only perform the same work as the younger, newer employees, they are frequently paid less and given heavier and more onerous duties and assignments, including training the newer employees to perform duties of positions to which Plaintiffs had been denied promotion and attendant pay increases.

66.   Plaintiffs have been consistently passed-over for promotions and/or salary increases, and simply not considered for any career growth opportunities, in favor of younger, less experienced, and overwhelmingly white employees who have relied on the training and expertise of the Plaintiffs to navigate and gain experience in the various programs and departments within HPD's Office of Development and throughout HPD.   As a consequence, these younger, white employees invariably advanced to become supervisors and superiors of the very Plaintiffs who have trained and developed them within the agency.

67.   In many instances where Plaintiffs were offered promotions, it was in title only—and not accompanied by a salary increase.  As a consequence, Plaintiffs are simply given greater responsibilities, special assignments and a heavier workload, without additional compensation.

68.   In order to advance their discriminatory objectives, Defendants employed subterfuge and devised various means to circumvent the established promotion and advancement process within HPD.

69.   In furtherance of their objectives, Defendants frequently create new job titles and positions, and reorganize divisions, with specific, preferred candidates in mind who were typically white, younger, and newer to HPD than the Plaintiffs. These newly created titles were then used to justify salary increases for those younger, predominantly white newer employees.

70.   Furthermore, Defendants often interview and/or select their preferred candidates—predominantly white, youthful and newer employees—*even before* a Vacancy Notice for an open position was posted, or before agency-wide interview schedules were announced. As a result, the Plaintiffs are effectively "blocked" and deprived of the opportunity to apply or interview for such higher salaried positions.

71.   For example, in September 2009, Raymond Hodges, Cha Lee, and Julie Behrens, younger employees in or about their thirties, were appointed Deputy Directors of Special Needs Housing.   In May 2010—months following the selection and announcement of Hodges, Lee, and Behrens as Deputy Directors—advertisements for the position was Deputy Director was retroactively listed on an external city posting website.   However, advertisements were not placed on the internal HPD employee portal accessed by the Plaintiffs and others similarly situated.

72.   The creation of three Deputy Director positions in the Special Needs Housing Division was simply a means to promote and advance these younger,

newer employees.   The division, at the time, had a mere fourteen (14) staff members yet one Director and three Deputy Directors, all of whom had no staff reporting directly under them.

73.    Defendants maintain a pattern and practice of fast tracking younger, newer employees by placing them on high-profile and premiere development deals and giving them more deals than older, non-white employees in an effort to enhance their image and promote them more quickly.

74.    For example, Elizabeth Seward was with HPD for five (5) years before leaving and claims to have handled approximately $800 million worth of development deals during her short time at HPD.

75.    In addition to the foregoing discriminatory, surreptitious and nepotistic devices, Defendants would simply "stonewall" the Plaintiffs, by refusing to respond to their applications for open positions or formally inform them whether or not a decision had been reached or a candidate selected for such open positions. As a consequence, Plaintiffs and others similarly situated are actively and subliminally discouraged from applying for promotional opportunities—the postural message to Plaintiffs being: "don't even bother."

76.    Similarly, Defendants maintained a pattern and practice of excluding older and minority employees from special training events, enrichment programs, and initiatives.   In 2006, HPD held a training session for ACE Scholars and

management purposefully excluded, or otherwise failed to invite, older employees (tenured staff). In 2010, ARONSON sent a blind e-mail to female staff members at HPD encouraging them to participate in the Women in Housing and Finance organization.   However, older employees (tenured staff) were once again purposefully excluded, or otherwise not invited to participate until 2011 or 2012.

77.   The named Plaintiffs, others similarly situated, and the Union representing them have repeatedly protested the foregoing discriminatory practices and policies to HPD's senior management staff and to three successive Commissioners of HPD, including defendant WAMBUA, all to no avail.

78.   In or about September 2009, the President of Local 375, the Union representing the Plaintiffs, complained to HPD regarding the foregoing preferential and discriminatory employment practices. Plaintiffs also protested these practices in a written complaint to New York City Councilwoman Letitia James.

79.   HPD and the named Defendants knew, and ought reasonably to have known, that the consequence of these policies and practices was an adverse impact on the prospects, as well as terms and conditions of employment, of its tenured, older employees who were predominantly non-white.

80.   In or about April 2007, and partly in response to complaints and grievances regarding the inequities of the preferential advancement policies, HPD's then-Commissioner, Shaun Donovan, commissioned a Staff Working

Group to address issues and challenges surrounding career development within HPD, in general, and its Office of Development, in particular.

81.    The published outcome of the Staff Working Group consistently identified the existence of a strong resentment and dissatisfaction among the older, tenured employees—with existing obstacles to career advancement, as well as the nepotistic and preferential hiring policies and practices within HPD.

82.    Nevertheless, Defendant CITY, through HPD management, as well as the named Defendants have maintained, and continue to engage in, discriminatory policies and practices that deprive the Plaintiffs of the fair promotion, salary and career advancement opportunities guaranteed to them under the law.

83.    Within the past two years immediately preceding the commencement of this action, HPD has given promotions and salary increases, almost exclusively, to many of the younger and predominantly white, newer staff (i.e., staff with seven years (7) or less in the agency). This has perpetuated and exacerbated the vast disparities in both career and income advancement between the older, non-white, tenured employees (i.e., staff with eight (8) or more years in HPD), and the younger, predominantly white newer employees.

### *Defendant CITY Maintains a Pattern and Practice of Discrimination*

84.    At all relevant times, the CITY and particularly the senior management at HPD, maintain a pattern and practice of unlawful discrimination on

the basis of age, sex, race, color, ancestry, and national origin, in hiring, retention, promotion, and compensation of employees, and indeed have been found by a jury in this court to have discriminated and retaliated against employees for complaining about discriminatory conduct or for perceived violations of law.

85.    The unlawful treatment of Plaintiffs is not an isolated event. Defendant CITY is aware (from lawsuits, notices of claims, and complaints filed against it in this court and elsewhere) that many senior officials, including the Defendants, are insufficiently trained in the area of equal employment opportunity including discrimination on the basis of age, sex, race, color, ancestry, and national origin, and retaliating against employees for complaining about discrimination or other unlawful activity.

86.    Defendant CITY is further aware that such improper training and failure to train has often resulted in deprivation of civil rights, including unlawful discrimination and retaliation at HPD. The notice has been provided from internal EEO complaints, lawsuits filed in this court, settlements and verdicts reached in this court, and audits from the CITY's own agencies.

87.    Despite such notice over a long period of time from different sources, Defendant CITY has failed to take any or appropriate corrective action. This deliberate indifference to training managers at HPD and protecting against future discriminatory conduct against employees has directly caused the individual Defendants in the present

case to violate Plaintiffs' civil and human rights as they worked in an environment where managers were not properly trained in civil rights and, like the other cases that provided notice, they failed to promote or grant Plaintiffs salary increases, and passed Plaintiffs over for promotion based on considerations of age, race, and color, which are the same behaviors that had led the CITY to be given notice and/or found liable for civil rights violations in the past.

88.     Moreover, upon information and belief, Defendant CITY was aware, prior to the acts the subject of this lawsuit, that the individual defendants lacked the objectivity, temperament, discretion and disposition to be employed in senior management positions making personnel decisions without regard to age, race, and color. Despite such notice, Defendant CITY has retained these individuals and failed to adequately train or supervise them, and was deliberately indifferent to their unlawful conduct toward older employees and employees in other protected calluses, in terms of hiring, promotion, treatment and retention.

*Plaintiff SINCLAIR's Skill, Qualifications, Experience, and Mistreatment:*

89.     Plaintiff, SINCLAIR, at age 60 years, and with approximately thirty-five (35) years of continuous employment with HPD, in various positions and title, is a "tenured" employee.

90.     Throughout the years of her employment, SINCLAIR has accumulated extensive experience at HPD, having held various positions, including

- 20 -

those of Project Manager and Deputy Director.

91.    SINCLAIR was well qualified for those positions and has an excellent record of performance and accomplishments with complex housing development projects. Over the years, she has successfully closed development projects with a financing value in excess of $117,355,000.

92.    Throughout her time as Project Manager, SINCLAIR has received numerous acknowledgments and positive feedback from third-parties and private individuals with regard to her dedication, professionalism, work ethic, and ability to achieve a mutually beneficial end result for all involved in development deals.

93.    Despite her extensive experience, job performance and accomplishments, Defendants have refused to grant SINCLAIR a salary increase for the past ten (10) years, and her career advancement has been stagnated and stymied—even after she successfully passed and was certified on the list for the Open Competitive City Planner title in 2012.

94.    Since 2004, each time SINCLAIR applied for a position with a higher salary, she was denied a position, or was otherwise prevented from interviewing for them by the various subterfuges employed by Defendants to circumvent established hiring, promotion, and salary increase procedures. The higher paying positions were subsequently awarded to younger, predominantly white employees with experience of seven (7) years or less in the agency.

95.    In or about 2007, SINCLAIR applied for the position of Director, Production Support in the Office of Development of HPD. Although SINCLAIR was well qualified for the position, she was denied the position, and KRISTEN RESAR, a less qualified, younger, white female was hired.

96.    Also, in or about December 2007, SINCLAIR applied for the position of Administration Project Director for Homeownership Progress in the Office of Development. Despite the fact that SINCLAIR was well qualified for the position, she was not selected for the position. Instead, KATHERINE WELLS, a white female was hired.

97.    In or about July 2012, SINCLAIR applied yet again for the position of Deputy Director for Multi-Family New Construction in the Office of Development. Despite SINCLAIR's superior qualifications, she was not selected for the position. Rather, MARK WEAVER, a younger less experienced black male was selected for the position.

98.    In or about October 2012, SINCLAIR again applied for the position of Director in the Office of Development. Despite her qualifications and experience, SINCLAIR was denied the position, and ANNA FRANTZ, a younger white female was selected.

99.    In or about February 2013, SINCLAIR applied for the position of Deputy Director in the HUD Multi-Family Program in the Office of Development.

- 22 -

Despite SINCLAIR's superior qualifications, she was not selected for the position. Instead, FRANZ HEWITT, a younger less experienced black male was selected for the position.

100. Recently, in or about June 2013, SINCLAIR applied for the position of Deputy Director in the Conversions Unit of the Office of Development. Although Sinclair was qualified for the position, she was passed over and less experienced, younger female was selected on the spurious grounds that the position required a bilingual person, which was not one of the requirements listed on the Vacancy Notice for the position.

101. As previously stated, in 2010, SINCLAIR took the open competitive examination for the City Planner Level I-IV title. In January 2012, a Civil Service list was established for the City Planner Level I-IV title. Of the two-hundred and seventy four (274) candidates on the list city-wide, seventeen (17) were HPD employees, of that number, only two (2), SINCLAIR and one other, were African-Americans.

102. Since the Civil Service list for the City Planner Level I-IV title was established in January 2012, SINCLAIR has requested, on two separate occasions that she be given a salary increase based upon her position on the list and proven track record at HPD. However, HPD management, including defendants, have failed and refused to increase her salary to an amount greater than $1,800 per

annum above her current salary.

103.   In contrast, several younger, white and newer employees, who are on the Civil Service  list for the City Planner List Level I-IV position—such as Eunice Suh, Elizabeth Seward, Gabriella Amabile, Sara Levenson, and Jennifer Jacobs-Guzman—were provided substantial salary increases. For example, Sara Levenson, a white female in her thirties, has a current salary of $90,000—an increase from $68,000 in 2012, and in July 2013 was promoted to a Director position, and her salary further increased by $22,000.00. Similarly, Jennifer Jacobs-Guzman, a white female in her thirties, has a current salary of $85,000. In addition, Elizabeth Seward, a white female in her thirties, was appointed Director of Pipeline Development, and had a salary of approximately $90,000 prior to leaving HPD in 2013. Moreover, upon information and belief, Gabriella Amabile, a white female in her thirties, was recently in 2013 appointed Assistant Commissioner of Planning, Marketing, & Sustainability, and her salary has increased from approximately $86,000 to more than $110,000.

104.   Between 2005 and 2012, several positions and titles with a salary range broad enough to support preferential salary increases, were created by Defendants, specifically or in part, to justify a salary increase for younger, and predominantly white newer employees. Examples of these positions and titles include, but are not limited to: Director  of Inclusionary Housing (2006); Director

of Year 15 Program (2006); Director of HUD Multifamily Program (2007);
Director of Housing Trust Fund/Special Initiatives (2007); Director of Policy
Analysis & Operations (2009); Director of Storm Recovery (2012); BCAP
Business Analyst (2012); and Director of Pipeline Development (2013).

105. These positions were created for and/or used to justify salary increases
for newer, less experienced, younger white employees in the Office of
Development of HPD—such as Kristen Resar, Elizabeth ("Betsy") Lawson, Kerry
McLaughlin, Kimberly Darga, Leora Jontef, Andrew Cohen, Elizabeth Seward,
and Katherine Wells, among numerous others—all of whom had seven (7) years or
less with HPD and were less qualified than SINCLAIR.

106. After thirty-five (35) years of distinguished service, SINCLAIR's
base salary remains stagnant, at just $72,383 per annum—and save for
collectively-bargained union raises—she has not had a merit-based pay raise in the
past for ten (10) years.

*Plaintiff SHERARD's Skill, Qualifications, Experience, and Mistreatment:*

107. Plaintiff, SHERARD, at age 56 years, and with approximately twenty-
eight (28) years of continuous employment with HPD in various positions and
titles, is a "tenured" employee.

108. Throughout the years of her employment, SHERARD has
accumulated extensive experience at HPD, and has an excellent record of

performance and accomplishments with complex, multi-million dollar housing development projects; over the years, she has successfully managed and closed development projects with a financing value in excess of several hundred million dollars.

109. Performance evaluations, authored by Director, Brooklyn Planning, JACK HAMMER ("HAMMER"), SHERARD's supervisor, include many high ratings and positive statements, for example:

(a) "Diane works very well with staff, is very responsive to the many levels of challenges that come her way, and is a team player." (July 2006);

(b) "I envision Diane taking an increased role in representing the office." (September 2008); and,

(c) "[R]outinely able to effectively step in and work on specific projects in those instances when project staff is absent" and a "major asset to the functioning of the Brooklyn Planning unit." (May 2009)

110. Despite her extensive experience, outstanding job performance evaluations, and accomplishments, Defendants have refused to grant SHERARD a merit-based salary increase for the past eight (8) years, and her career advancement has been stagnated and stymied.

111. At different times between 2004 and 2012, each time SHERARD approached her supervisors about a salary increase she was continuously overlooked, and otherwise denied, by the various subterfuges employed by

Defendants to circumvent established salary increase procedures.

112.  For example, in or about July 2004, SHERARD applied for the position of Housing Development Specialist within the Housing Education Unit, for which she was qualified.  However, she was not selected for an interview and simply received a letter thanking her for her application.

113.  Since 2005, SHERARD has never been considered for promotion by defendants.  Instead, younger less experienced, and newer, white employees were repeatedly considered and promoted over SHERARD.

114.  On December 19, 2012, DE LA TORRE came to SHERARD's office and told her that she appreciated her hard work on high-profile projects and that her contributions had not gone unnoticed.  DE LA TORRE told SHERARD that, "if the stars aligned," she *might* receive a salary increase in the upcoming year.

115.  In or about late December 2012, Director, Brooklyn Planning, HAMMER, SHERARD's supervisor, came to SHERARD's office to discuss another high-profile project.  SHERARD complained to HAMMER she was seriously considering retiring, primarily due to failure to grant her promotions and a salary increases for next year.

116.  On January 16, 2013, SHERARD again complained to DE LA TORRE DE LA TORRE about unfairness, inequities, and salary disparities between younger, newer and older employees at HPD.

117. In this January 16, 2013 meeting, SHERARD asked DE LA TORRE when she intended to submit a request for a salary increase on behalf of SHERARD—DE LA TORRE refused to provide a firm answer. Instead, DE LA TORRE told SHERARD that two younger and white employees, Elizabeth Seward and Eunice Suh, hired in 2008 and previously supervised by SHERARD, who had been promoted and given new assignments, would be receiving salary increases. SHERARD asked if their raises had anything to do with the "stars aligning," and whether DE LA TORRE had made such remarks to them. DE LA TORRE became visibly frustrated but gave no answer. To date, SHERARD never received the salary increase.

118. In contrast, between 2005 and 2012, several positions and titles with a salary-range broad enough to support preferential salary increases were created by Defendants, specifically, or in part, to justify a salary increase for younger, and predominantly white, newer employees in SHERARD's section of HPD. Examples of these positions and titles include, but are not limited to: Director of Land Use Policy (2010) and Deputy Director of Land Use Policy (2012); Director of Large-Scale Planning (2012) and Director of Pipeline Development (2013).

119. These positions were created for and/or used to justify salary increases for newer, less experienced, younger or white employees—such as Thehbia Walters, Eunice Suh, Elizabeth Seward, and Gabriella Amabile, among numerous

others—all of whom had seven (7) years or less with HPD and were less qualified than SHERARD. In fact, SHERARD personally trained and supervised Walters, Suh, and Seward upon their joining HPD.

120. After twenty-eight (28) years of distinguished service, SHERARD's base salary has remained stagnant at just $72,616—and save for collectively-bargained union raises—she has not had a merit-based pay raise in the past eight (8) years, since 2005.

*Plaintiff MERCADO's Skill, Qualifications, Experience, and Mistreatment:*

121. Plaintiff, MERCADO, aged 54 years, and with twenty-eight (28) years of continuous employment with HPD in various positions and titles, is a "tenured" employee.

122. Throughout the years of her employment, MERCADO has accumulated extensive experience at HPD, having held various positions, including Project Manager and Deputy Director.

123. MERCADO was well qualified for those positions and has an excellent record of performance and accomplishments with complex housing development projects, and over the years, has successfully closed development projects with a financing value in excess of Forty-Seven Million ($47,000.00) Dollars.

124. Despite her extensive experience, outstanding performance

evaluations, and accomplishments, Defendants have refused to promote MERCADO to a higher salaried position or grant her a merit-based salary increase for the past twelve (12) years, and her career advancement has been stagnated and stymied.

125. At different times between 2004 and 2012, each time MERCADO applied for a position with a higher salary, she was denied such positions, or was otherwise prevented from either applying or interviewing for them by the various subterfuges employed by Defendants to circumvent established hiring, promotion and salary increase procedures.

126. For example, in or about 2007, and upon discovering that the incumbent of the position was leaving HPD, MERCADO inquired about applying for the position of Director in the Office of Development.

127. Although the position of Director in the Office of Development was an impending vacancy, Defendants never publicly posted a Vacancy Notice—as required by established procedures. As a result, MERCADO and others similarly situated did not have an opportunity to apply, and be considered, for the position, which was surreptitiously given to a younger, white employee who had been employed with HPD for only eighteen (18) months.

128. Similarly, between 2007 and 2013, MERCADO applied for various higher salaried positions including: Deputy Director of Housing Trust Fund

Program in 2007 and 2008; Director of PLP in December 2012; and Deputy Director of the Multifamily Housing Program in December 2012). However, MERCADO was passed over and these positions were given to less qualified, white or younger employees with less experience in the agency, such as Anna Frantz and Franz Hewitt.

129.   In contrast, between 2005 and 2012, several positions and titles with a salary range broad enough to support preferential salary increases were created by Defendants, specifically or in part to justify a salary increase to younger, and predominantly white newer employees.   Examples of these positions and titles include, but are not limited to: Director of Inclusionary Housing (2006); Director of Year 15 Program (2006); Director of HUD Multifamily Program (2007); Director of Housing Trust Fund/Special Initiatives (2007); Director of Policy Analysis & Operations (2009); Director of Storm Recovery (2012); BCAP Business Analyst (2012); and Director of Pipeline Development (2013).

130.   These positions were created for and/or used to justify salary increases for newer, less experienced, younger white employees—such as Betsy Lawson, Thehbia Walters, and Katherine Wells, among numerous others—all of whom had seven (7) years or less with HPD and were less qualified than MERCADO.

131.   After twenty-eight (28) years of distinguished service, MERCADO's base salary has remained stagnant, at just $76,107 per annum over the past twelve

(12) years, and save for collectively bargained union raises, has not received a merit-based raise since 2001.

*Plaintiff HOLDER's Skill, Qualifications, Experience, and Mistreatment:*

132. At all times relevant, Plaintiff, HOLDER, an African-American female aged 58 years, was employed with HPD in various positions and titles, for approximately twenty-seven (27) years, and is a "tenured" employee.

133. Throughout her twenty-seven (27) years of employment, HOLDER accumulated extensive experience at HPD, having held various positions, including Real Property Manager, Associate Real Property Manager, Deputy Director of Commercial Leasing, Project Manager, City Planner (Deputy Director), and Mortgage Officer, Article 8A Loan Program.

134. HOLDER was well qualified for those positions and maintained an excellent record of performance and accomplishments with complex housing development projects.

135. In July 2008, HOLDER was one of four individuals at HPD selected to participate in a special pilot project (Office of Development Automation) to learn a new computer program that cost HPD $5 million to implement. Despite participating for one year and becoming fluent in the program, HOLDER received no additional compensation or acknowledgment for her selection and participation in this initiative.

136.   In or about 2008, HOLDER requested a transfer from HPD Planning, where she served as Deputy Director of North Brooklyn Planning under HAMMER, to the Article 8A Loan Program, where she became a Project Manager under Director Roger Ho ("HO").  It was agreed that this would constitute a lateral personnel action.  However, HOLDER incurred a $3,000 decrease in salary upon transfer.  When HOLDER approached HO about this salary decrease, he promised to make it up later—but HO failed to do so and to date no salary increase was ever granted to her.

137.   At all times relevant, HOLDER held the title of Project Manager of the Article 8A Loan Program within HPD's Office of Preservation Finance.  In this position, her duties and responsibilities included underwriting construction loans for complex housing development projects from conception and financing to closing, under various HPD development programs, including the Article 8A program, and the HOME program.

138.  Despite her extensive experience, outstanding performance evaluations, and accomplishments, Defendants refused to promote HOLDER to a higher salaried position or grant her a merit-based salary increase during her twenty-seven (27) years of employment, and her career advancement at HPD was stagnated and stymied.

139.   HOLDER never received complaints about her work, time, or project

- 33 -

management performance.  No disciplinary action was taken against her nor did she experience problems with supervisory staff.   In fact, HOLDER was consistently awarded special and more challenging assignments, albeit without financial compensation.

140.  Each time HOLDER applied for a position with a higher salary, or sought a salary increase, she was denied such positions, or was otherwise prevented from either applying or interviewing for them by the various subterfuges employed by Defendants to circumvent established hiring, promotion and salary increase procedures.

141.  In the few instances HOLDER received a promotion, she did not receive a salary increase, despite the fact that the salary posted for the positions ranged between $80,000 and $100,000.  Despite being qualified, HOLDER was consistently overlooked, and positions were instead given to predominantly white young, newer employees.

142.  For example, in or about 2007, and upon discovering that the incumbent of the position was leaving HPD, HOLDER inquired about applying for the position of program Director of Multifamily Housing.

143.  Although the position of Director of Multifamily Housing was an impending vacancy, a vacancy notice was never publicly posted as required by established procedures. As such, HOLDER and others similarly situated did not

have an opportunity to apply for the position, which had been surreptitiously given to a younger, white employee, who had been employed with HPD for only eighteen (18) months.

144. Similarly, in 2012 and 2013, HOLDER applied for various higher salaried positions such as Deputy Director of PLP, and Deputy Director for the Housing Trust Fund, New Construction and Multi Family programs, respectively. However, HOLDER was passed over and these positions were given to less qualified white or younger employees with less experience in the agency.

145. In contrast, between 2005 and 2012, several positions and titles with a salary range broad enough to support preferential salary increases, were created by Defendants, specifically or in part to justify a salary increase for younger, and predominantly white newer employees. Examples of these positions and titles include but are not limited to: Executive Director of PLP; BCAP Business Analyst; Chief of Staff; Director of Policy Analysis & Operations; and Director of the Multifamily Housing Program; Director, PLP; Assistant Commissioner, Preservation Finance; Assistant Commissioner, Supportive Housing; Director of Operations, Preservation Finance Division; Deputy Commissioner, Preservation Finance Division.

146. These positions were created for and/or used to justify salary increases for newer, less experienced, younger white employees—such as Betsy Lawson,

Thebhia Walters, Katherine Wells, Kristen Resar, Elaine Calos, KATZ, WEINSTEIN, FRANTZ, among numerous others—all of whom had seven (7) years or less with HPD, and were less qualified than HOLDER.

147.   Upon information and belief, in or about December 2012, ARONSON created and modified job postings, and the dates on which they were posted, to hire specific individuals and acquaintances, and personally screened all applicants for these positions, conducted interviews, and led in the hiring of candidates for these positions.

148.   Between 2010 and 2013, HOLDER was passed over in favor of younger employees, who received special treatment and promotions, even when they had been out of the office for months. Instead, in or about 2011, Kimberly Darga, a younger employee, hired in 2006, who HOLDER was directed to close three loans for, received promotion to the position of Director of the Year 15 Program, a position which had not previously existed at HPD.

149.   In addition, in or about 2008, HOLDER was deprived of training opportunities that many of her younger, white colleagues were able to take advantage of.   Moreover, when special training such as HUD Home training occurred in 2011, HOLDER was advised there were no openings.

150.   In 2012, HOLDER complained to Director, Preservation Finance, FRANTZ, her direct supervisor, as well as ARONSON, about HPD's systematic

failure to promote and/or give her a salary increase. HOLDER explained that she had been with the agency for several years and never received any salary increases. She cited the fact that, in December 2012, she closed two difficult loans—all while her Director was on vacation, and helped the Preservation Finance unit meet its 2012 quota. Despite her complaints and explanations, HOLDER never received a salary increase.

151.   At all times relevant to this lawsuit, HOLDER performed the duties of Project Manager, with responsibility for underwriting construction loans for complex housing development projects from conception and financing to closing, under various HPD development programs, including the Article 8A program, and the HOME Program.

152.   Disappointed with Defendants and unable to continue to bear their unlawful conduct, on April 22, 2013, HOLDER left his employment with HPD and is currently employed as a Property Manager at a residential property management firm, where she received a $25,000 salary increase.

153.   After twenty-seven (27) years of distinguished service with HPD, HOLDER's base salary, for twelve (12) years, remained at just $64,000 per annum, and save for collectively bargained union raises and cost of living adjustments, she did not receive any salary increase.

*Defendants' Actions Continue and Warrant Injunctive and other Relief:*

154.  Defendants' actions were unlawful and in violation of Plaintiffs' rights under several amendments to the United States Constitution as well as Federal laws such as ADEA, Section 1981, and State and local laws, such as the New York City Human Rights Law, and New York State Human Rights Law.

155.  As a proximate result of defendants' conduct towards Plaintiffs, Plaintiffs have suffered and continue to suffer monetary loss, and damages, including the loss of past and future earnings, and other employment benefits.

156.  As a further proximate result of Defendants actions, named Plaintiffs have suffered and continue to suffer from severe emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

157.  The conduct of the individual defendants are outrageous and malicious; were intended to injure Plaintiffs, and was carried out with reckless indifference to Plaintiffs' protected civil rights, thereby entitling them to punitive damages.

158.  Plaintiffs have no complete, plain, clear or adequate remedy at law.

159.  Defendants must be restrained from further retaliation and discrimination against Plaintiffs and directed to cease and desist from their unlawful acts against Plaintiffs.

160. The acts of the defendants against Plaintiffs continue.

161. Plaintiffs believe that the defendants' unlawful acts against them will continue until this Court, by injunction and/or its judgment, compels otherwise.

## FIRST CAUSE OF ACTION
### (Pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1981)

Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

162. Defendants subjected Plaintiffs to differential terms and conditions of employment because of their race.

163. These differential terms and conditions of employment include, but are not limited to:

    a. Failure to grant Plaintiffs merit-based salary increases;

    b. Failure to hire and promote Plaintiffs to higher paying titles and positions within HPD;

    c. Depriving Plaintiffs of opportunities for career advancement;

    d. Implementing and enforcing a blanket policy of nurturing, promoting, compensating and advancing the careers of white employees who have been with HPD for seven (7) years or less, to the detriment of the Plaintiffs;

    e. Retaliating against Plaintiffs for protesting racial discrimination, by continuing to deny Plaintiffs promotion, merit-based pay increases,

and opportunities for career advancement.

164.   All the foregoing actions were taken by the Defendants in order to deprive Plaintiffs of employment and other contractual opportunities on account of their race.

165.   Because of the willful and deliberate actions of the Defendants, and as a proximate cause thereof, Plaintiffs have been and continues to be denied their right to equal employment opportunity in violation of Section 1981.

166.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Race and Color Discrimination in Violation of NYHRL)

167.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

168.   By adversely affecting the terms, conditions and privileges of Plaintiffs' employment because of their race and color, Defendants violated the New York State Human Rights Law.

169.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Race and Color Discrimination in Violation of NYCHRL)

170.  Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

171.  By adversely affecting the terms, conditions and privileges of Plaintiffs' employment because of their sex, race and color, Defendants violated New York City Human Rights Law.

172.  By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Age Discrimination in Violation of NYHRL and NYCHRL)

173.  Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

174.  As a direct and proximate result of defendants' policies, procedures and practices alleged herein, the Plaintiffs have been discriminated against with respect to the compensation, terms, conditions, or privileges of their employment, because of their age, in violation of NYHRL and NYCHRL.

175.  Such terms and conditions include, but are not limited to:

a.      Segregating and classifying HPD employees in a manner which tends to deprive, and, in fact, deprived named Plaintiffs of employment opportunities because of their age;

- 41 -

b.   Initiating, implementing and enforcing a blanket policy of nurturing, promoting, compensating and advancing the careers of younger employees under the age of 40 who have been with HPD for seven (7) years or less, to the detriment of the Plaintiffs;

c.   Failing to promote and/or grant increases in merit-based salary and other compensation to the named Plaintiffs because of their age; and,

d.   Adversely affecting the employee status of Plaintiffs by denying them career advancement opportunities, because of their age.

176.  By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

177.  Plaintiffs are entitled to declaratory judgment that the employment policies, practices and procedures adopted and implemented by defendants as alleged herein, are unlawful and in violation of NYHRL and NYCHRL.

178.  Unless injunctive relief is granted, Plaintiffs who are otherwise eligible for rights, benefits and protections afforded by NYHRL and NYCHRL will be irreparably harmed by defendants' continued refusal to comply with their statutory obligations.

- 42 -

179. By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## PUNITIVE DAMAGES

180. By reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendants herein-above alleged, Plaintiffs claim punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs seek to represent pray that the Court:

a) Issue an order for the following preliminary injunctive relief:

   i. Enjoining HPD from continuing with its pattern, practice and policy of classifying employees on the basis of age and tenure for purposes of promotion, salary increases and career advancement opportunities;

   ii. Enjoining HPD from the further withholding merit-based salary increases, promotion and career advancement opportunities to Plaintiffs who have been with the agency for eight (8) years or more; are Hispanic, African American or non-white; or are over the age of 40 years

b) Impanel a jury to hear Plaintiffs' claims;

c) Issue a judgment declaring that the HPD's pattern or practice

disparate treatment of the its employees who are who have been with the agency for eight (8) years or more; are Hispanic, African American or non-white; or are over the age of 40 years, is unlawful in that it violates § 1981, the laws of New York State and New York City, and the ADEA;

d) Award compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

e) Award all named Plaintiffs attorneys' fees pursuant to 42 U.S.C. § 1988;

f) Award all Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

g) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:     New York, New York
           November 20, 2013

Respectfully Submitted,

SAMUEL O. MADUEGBUNA (6084)
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiffs
110 Wall Street, 11th Floor
New York, New York 10005
(212) 232-0155

- 44 -

TO:    **DEFENDANTS**

THE CITY OF NEW YORK
c/o Corporation Counsel
Law Department
100 Church Street
New York, New York 10007

MATHEW WAMBUA
RHR Funding LLC
800 Third Avenue, Suite 350
New York, NY 10022

RUTHANNE VISNAUSKAS
Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038

ERIC ENDERLIN
Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038

ROBIN WEINSTEIN
3299 Cambridge Avenue, #4J
Bronx, New York 10463

MICHAL ARONSON
Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038

JESSICA KATZ
Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038

BEATRIZ DE LA TORRE
Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038

CLARE FARNEN
Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*                         *Docket No.:*

---

*WANDA SINCLAIR, DIANE SHERARD, ELIZABETH MERCADO, and SHARON HOLDER,*

                                        *Plaintiff,*

                    *-against-*

*THE CITY OF NEW YORK, MATHEW WAMBUA, RUTHANNE VISNAUSKAS, ERIC ENDERLIN, ROBIN WEINSTEIN, MICHAL ARONSON, JESSICA KATZ, BEATRIZ DE LA TORRE, CLARE FARNEN and JOHN and JANE DOES 1-5 (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),*

                                        *Defendants.*

---

### COMPLAINT AND JURY DEMAND

---

*Signature (Rule 130-1.1-a)*

---

*Print name beneath   SAMUEL O. MADUEGBUNA, ESQ.*

---

*Yours, etc.*

***MADUEGBUNA COOPER LLP***
***Attorneys for Plaintiff***
*110 Wall Street, 11th Floor*
*New York, New York 10005*
*(212) 232- 0155*

*To: All Counsel of Record*

*Service of the within is hereby admitted on*

---

*Attorneys for*